2007 VT 129

**UNION SCHOOL DISTRICT #45 v. WRIGHT & MORRISSEY, INC. v. Banwell White Arnold Hemberger & Partners, Inc. and Capital Earth Moving, Inc.**

[945 A.2d 348]

No. 06-033

*Cook* and *Katz*, JJ.

¶ 1. December 11, 2007. Defendant Wright & Morrissey, Inc. (Wright) appeals from a superior court judgment awarding $102,477 to plaintiff Union School District #45 for the costs to reconstruct sidewalks damaged by frost heaves less than a year after they were built. Wright contends the judgment must be reversed because: (1) an arbitration agreement between the parties divested the court of subject matter jurisdiction; (2) the District failed to comply with the contract's alternative-dispute resolution procedures; (3) the court based its decision upon an erroneous finding that the project architect had determined Wright to be liable for the costs to implement recommended design changes; and (4) the court improperly declined to award prejudgment interest on its counterclaim. We reverse the court's prejudgment interest ruling and affirm in all other respects.

¶ 2. In 1996, the District entered into a contract with Wright for the construction of a new middle school designed by the architectural firm of Banwell White Arnold Hemberger & Partners, Inc. (Banwell). The school was completed in the summer of 1997 and in use by September. That winter, however, a stretch of sidewalk adjacent to the school suffered damage due to frost heaves. The damage became more acute over the next several winters. In May 2000, an engineering firm hired by Banwell to determine the cause of the problem issued a report (the Knight report) indicating that it was partly the result of sub-base gravel which did not conform to the design specifications. Wright, the contractor, was made aware of the Knight report and, in response, engaged its own expert who issued an analysis (the Willis report) concluding that the frost heaves were primarily caused by the architect's failure to include adequate drainage, or "groundwater control" in its original design. Neither the architect nor the contractor, therefore, accepted responsibility for the frost-heave problem or the cost of repair.

¶ 3. To resolve the apparent deadlock, the District hired its own engineering firm, Lamoureux & Dickinson, to assess what went wrong and recommend a remedy. The resulting report (the Lamoureux report) contained a detailed, comprehen-

sive analysis of the soil and groundwater characteristics of the project area and their relation to the frost-heave problem. The report essentially concluded that the contractor and architect shared responsibility, indicating that tests had revealed some deviation from the original plans as well as the need for some additional groundwater control measures. The report set forth five specific "recommendations to remedy the sidewalk heaving problem." Subsequent efforts by the District to negotiate an allocation of costs for reconstruction of the sidewalk in accordance with the Lamoureux report recommendations, however, proved to be unsuccessful.

¶ 4. Accordingly, in December 2001, the District, through its attorney, notified Banwell's attorney that it was implementing § 4.3.2 of the General Conditions of the Contract for Construction (General Conditions), a standard form agreement promulgated by the American Institute of Architects that was incorporated as an addendum to the construction contract. The provision invoked by the District establishes a two-step alternative-dispute-resolution (ADR) process for claims relating to the contract. It states, in pertinent part, that "[c]laims, including those alleging an error or omission by the Architect, shall be referred initially to the Architect for action as provided in Paragraph 4.4." The latter provision prescribes a series of steps to be taken by the contractually designated "Architect," in this case Banwell, in response to a claim. After reviewing the claim, "the Architect" is to issue a preliminary response, which may include a request for additional data, rejection of the claim in whole or part, approval of the claim, or a proposal for compromise. Thereafter, if the claim has not been resolved, "the Architect" is to issue a final decision "which decision shall be final and binding on the parties but subject to arbitration." General Conditions, § 4.4.4. Either party may then pro-

ceed to the second step in the ADR process, arbitration. As provided in the General Conditions, when a decision of "the Architect" states that it is "final but subject to arbitration," a demand for arbitration "must be made within 30 days after the date on which the party making the demand receives the final written decision." General Conditions, § 4.5.4.1 Furthermore, a "failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner [i.e., the District] and Contractor." *Id.*

¶ 5. The District's letter identified four claims: (1) that the sidewalks were improperly designed; (2) that Wright failed to notify the District and the architect in a timely manner of errors or omissions in the design plans; (3) that Wright failed to construct the sidewalks in conformance with the plans and specifications; and (4) any combination of the above. The District requested "that these claims be resolved by implementation, at no cost to the District, of the recommendations set forth" in the Lamoureux report. In early January 2002, Banwell's attorney sent a letter to the District "to serve as Banwell Architect's Decision under § 4.4, et seq. of the General Conditions." The letter succinctly responded to each of the four claims. With respect to the claim of design error, the letter stated that "[t]he Architect rejects this claim in its entirety." As to the failure to notify, the letter reiterated Banwell's conclusion that there were no errors or omissions in the design plans, but "assuming arguendo that there were" agreed that the contractor was required to report them. Finally, with respect to the claim that Wright had failed to construct the sidewalks in accordance with the plans, the letter indicated that "[t]he Architect agrees with this claim in its entirety." The letter closed with the conclusion "that the responsibility for this claim rests with the Contractor, as supported by the 7/01 [Lamoureux & Dickinson] report."

¶ 6. For reasons unclear from the record, Banwell's attorney issued a second letter, in April 2002, restating the findings from the first letter.[1] This was followed within several days by a brief notice on behalf of Banwell, dated April 18, 2002, stating that, as provided in the General Conditions, the second letter "constitutes the Architect's final decision," that the "decision is final but subject to arbitration," that any demand for arbitration must be made within thirty days, and that failure to demand arbitration within the thirty-day period "shall result in the Architect's decision becoming final and binding upon the [District] and Contractor."

¶ 7. Wright neither requested arbitration following Banwell's decision nor undertook to reconstruct the sidewalks in accordance with recommendations in the Lamoureux report. Accordingly, in August 2002, the District filed a complaint in superior court seeking to enforce Banwell's "final and binding" decision by compelling Wright to perform the corrective work. The action was later amended to one for monetary damages to recover the costs of performing the work in question. Thereafter, in a series of preliminary rulings, the trial court determined that the parties had effectively waived arbitration, resulting in Banwell's decision becoming final and binding; rejected Wright's claim that certain procedural deviations from the General Conditions invalidated Banwell's decision; concluded that the absence of a specific remedy in Banwell's decision was not fatal to the decision as a whole; and ruled that damages would be established at trial. Follow-ing an evidentiary hearing, the court issued a final written decision concluding that, by approving the District's claim against Wright, Banwell had implicitly granted the relief sought, to wit, implementation of the recommendations in the Lamoureux report.[2] Evidence adduced at the hearing indicated that implementation would cost $107,477, and the court awarded this amount. Offset by $5,000 that remained due and owing on the contract, the final judgment in favor of the District amounted to $102,477. The court declined to award prejudgment interest on the $5,000 offset. This appeal followed.

¶ 8. Wright first contends that the court lacked subject matter jurisdiction because the dispute was subject to an arbitration agreement. We recently rejected an identical claim in *Lamell Lumber Corp. v. Newstress International, Inc.*, 2007 VT 83, ¶ 7, 182 Vt. 282, 938 A.2d 1215, where we found no persuasive authority to "'oust' the superior court of general jurisdiction over a civil suit arising from a contract containing an arbitration agreement." As we explained, "[a]n arbitration agreement . . . remains a creature of *contract* reflecting a voluntary agreement between the parties and as such may be waived by the parties." *Id.* ¶ 9. Indeed, as the court here found, the parties plainly waived their right to arbitration by failing to file a demand for arbitration within 30 days of Banwell's final decision, or at any time thereafter. We therefore reject the claim that the trial court lacked subject matter jurisdiction.

¶ 9. Wright next contends that certain deviations from the procedures set forth in the General Conditions render Banwell's decision invalid. We note, at the outset, that Wright failed to raise any of

---

[1] Banwell may have intended the first letter to serve as its "preliminary" response, as called for in § 4.4.1 of the General Conditions, and the second letter to serve as its final decision after the parties indicated that the dispute remained unresolved.

[2] This finding by Judge Katz was somewhat inconsistent with the earlier decision by Judge Cook indicating that Banwell had failed to grant relief.

these procedural claims during the ADR process. To the extent, therefore, that the proceedings before Banwell may be analogized to arbitration, the claims were plainly waived. See *Montpelier Bd. of Sch. Comm'rs v. Montpelier Educ. Ass'n*, 167 Vt. 570, 571-72, 702 A.2d 390, 391 (1997) (mem.) (recognizing rule that a party who fails to raise procedural objections in arbitration proceeding may not raise them later in court). Although courts have reached differing conclusions concerning the nature of ADR proceedings before design professionals such as engineers and architects, they have been widely accepted and enforced as a relatively speedy and efficient private ADR mechanism. See, e.g., *Brookfield-N. Riverside Water Comm'n v. Abbott Contractors, Inc.*, 621 N.E.2d 153, 158 (Ill. App. Ct. 1993) (holding that trial court erred in granting motion to arbitrate because contractor's "failure to demand arbitration within a timely fashion . . . rendered the engineer's . . . decision final and binding"); *City of Huntington Woods v. Ajax Paving Indus., Inc.*, 441 N.W.2d 99, 102 (Mich. Ct. App. 1989) (noting that provisions for informal ADR proceedings before engineers and architects are "common in the construction industry" and holding that the trial court erred in failing "to treat the engineer's decision as a final arbitration award" when parties failed to request formal arbitration); *Brick Twp. Mun. Utilities Auth. v. Diversified R. B. & T. Constr. Co.*, 409 A.2d 806, 808-09 (N.J. Super. Ct. App. Div. 1979) (affirming trial court order enjoining contractor from arbitrating claim where it failed to file arbitration request within thirty days of engineer's ruling pursuant to contractual ADR provision); *Zandri Constr. Corp. v. Wolfe*, 737 N.Y.S.2d 400, 402 (App. Div. 2002) (concluding that "[t]he AIA contractual provision is an alternative dispute resolution mechanism which is valid, enforceable and favored as a matter of public policy"); cf. *Martel v. Bulotti*, 65

P.3d 192, 195-96 (Idaho 2003) (holding that, although architect could not be viewed as strictly analogous to arbitrator because of the potential for "non-neutrality," architect's order was nevertheless final and binding where parties failed to effectively seek arbitration within 30 days); see generally, T. Stipanowich, *Of "Procedural Arbitrability": The Effect of Noncompliance with Contract Claims Procedures*, 40 S.C. L. Rev. 847, 848-49 (1989) (reviewing history of private dispute resolution systems in construction industry and observing that "[t]he modern industry archetype is a multistage process including first-tier adjudication by design professionals and, when necessary, submission of controversies to a neutral panel of arbitrators"). We conclude, therefore, that the traditional waiver rule applies to ADR proceedings of the type at issue here to ensure that it remains an effective "alternative dispute mechanism rather than another expensive and time consuming layer to the already complex litigation process." *Joder Bldg. Corp. v. Lewis*, 153 Vt. 115, 120, 569 A.2d 471, 473 (1989) (explaining that the "waiver rule is consistent with our strong tradition of upholding arbitration awards whenever possible" (quotation omitted)).[3]

---

[3] We note that some commentators have criticized ADR proceedings of this type, questioning the ability of the design professional to remain neutral where it has a professional relationship with the owner and where its own professional judgment may be at issue, as was the case here. See, e.g., T. Stipanowich, *Beyond Arbitration: Innovation and Evolution in the United States Construction Industry*, 31 Wake Forest L. Rev. 65, 74 (1996) (noting concerns about the "conflict of interest inherent in the design professional's concurrent roles" as contractee with the owner and arbiter of disputes involving design defects); T. Galligan, *Extra Work in Construction Cases: Restitution, Relation-*

¶ 10. Even if considered on their merits, however, we are not persuaded that the alleged procedural infirmities invalidate Banwell's decision. Wright's first claim is predicated on the fact that, while the General Conditions direct that a claim "shall be referred initially to the Architect for action," General Conditions, § 4.3.2, the District sent its notice to the respective attorneys for Banwell and Wright rather than directly to them or to their authorized representatives under the contract. Although Wright asserts that this notice provision is "critical," it offers no explanation as to how or why. Indeed, Wright makes no argument that it was uninformed of the District's claim, that Banwell itself failed to receive notice of the claim, or that Wright was otherwise prejudiced in any respect by the fact that notice was served on the parties' attorneys. We find no reason, therefore, to invalidate Banwell's decision on this basis. See *Ploof v. Village of Enosburg Falls*, 147 Vt. 196, 202, 514 A.2d 1039, 1044 (1986) (failure to receive written grievance decision did not impede party's ability to bring suit or otherwise "redound[] to his prejudice"); *Rutz v. Essex Junction Prudential Committee*, 142 Vt. 400, 411-13, 457 A.2d 1368, 1373-75 (1983) (substantial compliance with notice requirement in administrative proceeding, coupled with lack of prejudice from failure to strictly comply, satisfied the notice requirement). Along similar lines, Wright also claims that the process was fatally undermined because Banwell's decision was served on the parties' attorneys rather than their

___

*ship, and Revision,* 63 Tul. L. Rev. 799, 868 (1989) (recognizing the inherent difficulty of acting fairly where the architect "has a professional/client relationship with the owner and is expected to resolve a dispute . . . between the owner and the contractor"). The District does not, however, specifically challenge Banwell's decision on the basis of an inherent conflict.

authorized representatives, but again Wright fails to argue or demonstrate that it was prejudiced as a result.

¶ 11. Wright next asserts that Banwell's decision was invalid because it was communicated to the parties in a letter from its attorney. The claim is that Jules Chatot, Banwell's authorized representative under the contract, was the only person empowered to render a decision and that "a decision by the attorney for Banwell White, or by the firm itself is not a decision by Jules Chatot." The claim is entirely unpersuasive. First, General Conditions § 4.1.1 provide that "[t]he term 'Architect' means the Architect *or* the Architect's authorized representative," and "the Architect" is identified in the contract as the firm of Banwell, White, Arnold, Hemberger & Partners, Inc. (Emphasis added.) Thus, either the firm or its representative was authorized to render a decision. Furthermore, the letters from the attorney state plainly that they are "to serve as *Banwell Architect's decision*," and they go on to describe *"the Architect's"* decision with respect to each of the District's four claims. (Emphasis added.) We find no support, therefore, for the claim that the decision was not rendered by Banwell. The mere fact, moreover, that the decision was communicated in a letter signed by the attorney on behalf of Banwell rather than by its members or authorized representative is a difference, at most, of form rather than substance.

¶ 12. Wright further contends that Banwell was powerless to render a decision because the District failed to file its claim "within 21 days after occurrence of the events giving rise to [the] claim or within 21 days after the claimant first recognized the condition giving rise to the claim," as provided in § 4.3.3 of the General Conditions. As we have seen, however, Wright waived this issue by failing to raise it in the first instance in the ADR proceeding. Furthermore, because arbi-

tration is strongly favored as a matter of public policy, a delay in seeking arbitration without some showing of prejudice to the party opposing it does not necessarily forfeit the right. See *Lamell*, 2007 VT 83, ¶ 11 (holding that the question of whether arbitration has been waived turns on a variety of factors, including "the timing of the request for arbitration" and "whether the party opposing arbitration has suffered prejudice"); accord *City of Cottonwood v. James L. Fann Contracting, Inc.*, 877 P.2d 284, 290 (Ariz. Ct. App. 1994) (holding that waiver of arbitration "requires not only a failure to adhere to time constraints in the arbitration agreement but also prejudice to the other party"); *Matthews-McCracken Rutland Corp. v. City of Plaquemine*, 414 So. 2d 756, 757 (La. 1982) (rejecting claim that a "mere delay in filing the demand for arbitration necessarily constitutes a waiver of the right to demand arbitration, especially in the absence of prejudice to the opposing party"); *Carteret County v. United Contractors of Kinston, Inc.*, 462 S.E.2d 816, 821 (N.C. Ct. App. 1995) (holding that defendant's failure to file a demand for arbitration within 21 days of events giving rise to the claim, as provided by the contract, did not forfeit the right to arbitration where "nothing in the record indicates plaintiff was prejudiced by defendant's alleged delay . . . and plaintiff makes no such argument"). The record here discloses that Wright was aware of the frost-heave problem from its inception and actively involved in the effort to identify its source and negotiate a solution, retaining its own expert in the process and reviewing the reports of those retained by Banwell and the District. We thus find no basis to conclude that Wright was prejudiced in any respect by the District's failure to file a claim within twenty-one days of discovery of the problem, and Wright has advanced no argument or evidence to demonstrate otherwise.

¶ 13. Wright's final complaint regarding procedure is that Banwell violated its right to due process by failing to hold a hearing or offer an opportunity to introduce evidence, cross-examine witnesses, or otherwise oppose the District's claims. Nothing in the record, however, shows that Wright ever requested such a hearing or sought to assert these rights, nor did it exercise its right under the agreement to a more formal arbitration proceeding following Banwell's decision. The claim, therefore, was waived.

¶ 14. Wright next contends the trial court erred in finding that Banwell's decision represented a final and binding decision granting relief in favor of the District. Because the Lamoureux report, on which the architect relied, did *not* recommend reconstruction in accordance with the *original* design plan, Wright maintains that Banwell's decision "does not award any relief to the District for the Contractor's alleged failure to construct the sidewalk in accordance with" that plan. While there may have been some inconsistency in Banwell's decision, there is no doubt of its purpose to grant the District relief in the form of the Lamoureux recommendations. The District specifically requested that all of its claims "be resolved by implementation, at no cost to the District, of the recommendations" in the Lamoureux report, and Banwell's decision, in agreeing with the District's claim against Wright "in its entirety," can reasonably be construed only as a finding of liability *and* an award of the relief requested. Indeed, Banwell made plain its intent to hold Wright responsible for the reconstruction pursuant to the report, concluding: "[T]he Architect believes that the responsibility for this claim rests with the contractor, as supported by the report issued by Lamoureux & Dickinson on behalf of the owner in July 2001." Accordingly, we find no error.

¶ 15. Finally, Wright contends that the court erred in failing to award prejudgment interest on the $5,000 damages it

received on its counterclaim for monies due and owing under the contract. The court explained its ruling in one sentence, stating that "[i]t would seem that no interest would accrue on the $5,000, in view of the greater obligation of Wright & Morrissey to the District." It appears that the court assumed an award in these circumstances was discretionary without considering whether, as plainly appears from the record evidence, the $5,000 payment withheld by the District was readily ascertainable and therefore subject to prejudgment interest as a matter of right. *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 463, 752 A.2d 26, 36 (2000). Accordingly, we conclude that the court erred in failing to award prejudgment interest, and therefore remand to the trial court to calculate the prejudgment interest award.

*That portion of the trial court judgment denying prejudgment interest is reversed, and the matter remanded to calculate the interest due and modify the judgment accordingly. In all other respects, the judgment is affirmed.*

Motion for reargument denied January 10, 2008.